UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE:

HEBREW HOSPITAL HOME OF WESTCHESTER, INC.

DEBTOR.

CHAPTER 11
CASE NO. 15-_____

---

### DECLARATION OF MARY FRANCES BARRETT, CHIEF EXECUTIVE OFFICER OF HEBREW HOSPITAL HOME OF WESTCHESTER, INC. (I) PURSUANT TO LOCAL RULE 1007-2 OF THE LOCAL RULES OF BANKRUPTCY PROCEDURE AND (II) IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Pursuant to FED. R. BANKR. P. 2014(a), Mary Frances Barrett declares:

1. I am the Chief Executive Officer of the debtor and debtor-in-possession, Hebrew Hospital Home of Westchester, Inc. ("Debtor"), in the above-captioned chapter 11 case ("Chapter 11 Case").

2. Unless otherwise stated in this declaration, I have personal knowledge of the facts hereinafter set forth.

## I. BACKGROUND

### [A] Legal Status

3. The Debtor is a New York not-for-profit corporation formed on February 17, 1993 pursuant to Section 402 of the Not-For Profit Corporation Law ("NFPCL"). The Debtor does not have any shareholders. It is a Board directed corporation and one of several distinct legal entities within the larger Hebrew Hospital Home health system, which was initially founded in 1928 as a not-for-profit nursing home in the Tremont section of the Bronx. I have served as the Chief Executive Officer of the Debtor since its incorporation.

4. The Debtor's predecessor, Hebrew Hospital Home, Inc. owned and operated a 480 bed skilled nursing facility located in the Bronx ("Bronx SNF"). In 1998, the Debtor opened a new 160 bed facility situated at 61 Grasslands Road, Valhalla, New York ("Westchester SNF"). In 2007, the Debtor sold the Bronx SNF.

### [B] Financial Issues

5. Following industry trends, the Debtor embarked upon an auxiliary program designed to provide health care services to clients who were residing in their own homes and apartments. At its peak, the Debtor's long-term home health care program serviced in excess of 400 clients. The conversion of the long-term home health care program to a Certified Home Health Agency ("CHHA") was approved by the New York State Department of Health ("NYSDOH") on July 7, 2014 (certificate # 700613) (the "CHHA License"). The Debtor's CHHA program provided in home intermittent health care support services to its clients, including assessments as to the level and scope of individualized services such as, occupational, speech and physical therapy, medical supplies, nursing and nutrition management. The Debtor's CHHA revenue was generated from a mix of private pay and government reimbursements (Medicaid and Medicare).

6. The Debtor experienced significant adverse financial results starting in 2009 and the losses continued on in 2010 and forward. Among the factors contributing to the decline were, lower census attributable to shorter stays, reduced reimbursement rates, the confluence of managed care, and fewer private paying clients with an increase in the client mix for whom payment was derived through Medicare and Medicaid.

## II. SALE OF DEBTOR'S ASSETS

7.  Given the Debtor's continued losses and the unlikely prospects to regain financial viability, in 2012 the Board determined that it should pursue a sale of the Debtor's assets and operations in order to maintain the continuity of care for its clients and in furtherance of its mission. The Debtor contacted the purchaser of the Bronx SNF to explore its interest in acquiring the Westchester SNF.

8.  In or about November of 2013, the Debtor entered into a Real Estate Purchase Agreement with an entity known as *Tarrytown II LLC* and *HHH Acquisition, LLC* (collectively, the "Purchasers"). The Purchasers are related parties to the buyer of the Bronx SNF. On April 30, 2015, the sale of the Westchester SNF was consummated.

9.  The aggregate adjusted purchase price was **$24,321,581.45**. It included the assumption of the extant mortgage with a principal balance of **$13,828,439.81** and the delivery of a **$471,570.82** promissory note from the Purchasers' principals (the "Purchaser Note"). After application of closing adjustments, the net proceeds of **$10,251,965.96** was deposited into an escrow account maintained by McCullough, Goldberger & Staudt at Sterling National Bank (the "Escrow Account"). [See **Exhibit A**]. In accordance with the State court order authorizing the sale, the escrowed funds could not be disbursed without the consent of the New York State Attorney General ("NYSAG") and the further order of the State court.

10. As discussed hereunder, to fund a prepetition bridge loan to Hebrew Hospital Senior Housing, Inc. ("HHSH") $3,500,000.00 was disbursed from the Escrow Account.

11. Post-closing the Purchaser continued to utilize the Debtor's Medicare and Medicaid provider numbers. This would necessitate reconciliation when the provider numbers were re-assigned to the Purchasers. In addition, it was contemplated that post-closing

3

adjustments would be adjustments were contemplated for carry over vacation and sick days in respect of those employees who were hired by the Purchaser. These post-closing reconciliations are still pending and not finalized.

12. Upon information and belief, the Debtor's Medicare number recently was assigned to the Purchaser. However, the Medicaid number is still pending assignment. This is a complicating factor in finalizing the reconciliation.

13. The Debtor retained its accounts receivable and cash. It hired an outside vendor to provide collection services.

14. Due to the small number of patients enrolled in the CHHA program (approximately 40) the Debtor in 2015 was incurring operating losses at the rate of approximately $250,000.00 per month. Therefore, the Debtor's Board determined that it should either sell the CHHA program or close it down. On or about July 25, 2015 the Debtor entered into an Asset Purchase Agreement with Premier Health Care Services, Inc. ("Premier") for the acquisition of the CHHA License, along with other related assets such as, tangible and intellectual property, supplies and data records. The purchase price was **$250,000.00**. Since the transfer of the CHHA License required regulatory approval, the transaction was structured such that Premier entered into an Interim Consultative & Management Services Agreement effective July 25, 2015 whereby Premier took over management of the Debtor's CHHA operations. It assumed all of the financial risks and revenue in respect thereof. The CHHA clients were transferred to other CHHAs. Premier provided the Debtor with a $250,000.00 loan that would be deemed the purchase price once the regulatory approval for the transfer of the CHHA License was obtained. The debtor delivered it promissory note in a like amount.

15. As of the Petition Date, Premier not yet received the required regulatory approval for the transfer of the CHHA License.

16. The Debtor does not have any active business operations. However, it still has responsibilities to wind-up its affairs, including finishing any remaining billing and processing, filing reports with regulatory agencies and closing its books and records. The true-up process and final reconciliation with the Purchasers of the Westchester SNF is incomplete.

## II. Events Leading to Bankruptcy

17. Direct creditors of the Debtor anticipated payment from the Westchester SNF sale. The Debtor calculated that the transaction generated more than sufficient funds to pay its direct creditors, excluding the projected amount of the potential ERISA withdrawal liability claim that eventually will be asserted by the 1199 pension funds (the "Withdrawal Liability Claim"). However, factoring in the anticipated value of the Withdrawal Liability Claim (even at 50%), the Debtor's balance sheet is substantially negative. Several creditors have institute legal proceedings to recover judgments.

18. As mentioned above, HHSH was the recipient of a $3,500,000.00 loan from the Debtor that was funded on or about November 9, 2015 (the "HHSH Secured Bridge Loan"). The purpose of that loan was to fund HHSH's operation into its chapter 11 proceeding given the inability for HHSH to obtain operating capital from any other source. A subordinate mortgage for $3,500,000.00 was recorded to secure the HHSH Secured Bridge Loan. The Westchester County Industrial Development Agency ("WCIDA") as the record fee owner executed the junior mortgage (the "HHSH Second Mortgage"). It is subordinate to a mortgage held by the Manufacturers and Traders Trust Company ("M&T Bank"), which is collateral for its obligation under a certain letter of credit in favor the bond trustee.

5

19. The HHSH Secured Bridge Loan was the result of lengthy negotiations among numerous parties and constituents, including the NYSAG, legal counsel for the HHSH residents, and the respective boards of the Debtor and HHSH. Further, based upon the terms of a certain Restructure and Support Agreement, the State court presiding over the Westchester SNF sale approved the transaction. It was contemplated that the HHSH Secured Bridge Loan would be repaid from the proceeds of the $12.2 million dollar post-petition debtor-in-possession loan that HHSH was negotiating with Lapis Advisers ("HHSH DIP Loan").

20. HHSH filed its voluntary chapter 11 petition on December 9, 2015 in the United States Bankruptcy Court for the Southern District of New York in case # 15-13264-mew (the "HHSH Chapter 11 Case"). At the initial court proceedings concerning the HHSH Chapter 11 Case on December 15, 2015, the HHSH DIP Loan encountered substantial opposition from various constituents. The prospects for approval of the HHSH DIP Loan is in doubt.

21. The Debtor is a secured creditor in the HHSH Chapter 11 Case and the prospect for repayment of the HHSH Secured Bridge Loan likely will have to await the sale of HHSH's facility and business.

### III. BANKRUPTCY FILING

#### A. *Voluntary Petition*

22. The Debtor began this Chapter 11 Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 7, 2016 ("Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

23. The Debtor intends to assist in facilitating the sale of HHSH's assets, primarily through a post- petition loan facility up to $2,000,000.00 for operating capital, as the lender of last resort.

6

24.     In addition, the Debtor has been in negotiation with Bethel Nursing Home Company, Inc. (a third party developer and nursing home operator) to contribute 70 beds that are the subject of a separate Certificate of Need into a joint venture. This has the potential to generate $2,000,000.00 in additional liquidity once the nursing home opens for business. This transaction will be the subject of a separate motion for consideration and approval.

### B. *Summary of Estate*

25.     An initial *draft* of the Debtor's List of Creditors Holding 20 Largest Unsecured Claims is attached hereto as **Exhibit A**.

26.     The Debtor has no secured creditors.

27.     As of the Petition Date, the Debtor has the following assets:

  [a] $6,751,965.96 in the Escrow Account

  [b] $3,500,000.00 Note from HHSH

  [c] Accounts Receivable with face value of $2-$2.5M

  [d] CON for 70 Skilled Nursing Beds

  [e] Purchasers Note re sale of Westchester SNF $471,570.82

28.     The Debtor has no direct employees, its senior management team consists of the following:

  i.  Mary Frances Barrett / Chief Executive Officer (23 years) – responsibilities include carrying out policies and initiatives adopted by the Board of Directors of the Debtor, and experience includes 6 years as Chief Operating Officer of another not-for-profit organization;

  ii. Peter Cutaia / Chief Financial Officer (7 years (1+ as CFO)) – responsibilities include oversight of corporate financial records and

preparation and presentation of statements of financial status for the Board of Directors of the Debtor, and experience includes facilitation of community-based programming as Director of Finance for Community-Based Programs with the Hebrew Hospital Home health system;

### C. *First Day Motions*

29.  The only "first day" motions are a motion to jointly administer the Chapter 11 Case with Cases 15-13264 and 15-11158 ("Joint Administration") and the Debtor's motion to extend the time for filing its schedules and statement of final affairs.

30.  The Debtor in conjunction with the HHSH Chapter 11 Case will file a motion for the authorization to proceed with a $2,000,000.00 post-petition loan facility from the Debtor to HHSH.

31.  I am familiar with the contents of each of the First Day Pleadings. To the best of my knowledge, information and belief, the facts set forth therein are true and correct, and the relief sought is necessary to facilitate a successful conclusion to this Chapter 11 Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 7, 2016                               *s/ Mary Frances Barrett*
                                                     Mary Frances Barrett

# EXHIBIT A TO BARRETT DECLARATION

4788137_1

# HEBREW HOSPITAL HOME OF WESTCHESTER, INC. TO TARRYTOWN II, LLC AND HHH ACQUISITION, LLC

SALE OF HEBREW HOSPITAL HOME OF WESTCHESTER AND REAL ESTAET LOCATED AT 61 GRASSLANDS ROAD, VALHALLA, NEW YORK

## ADJUSTMENTS COMPUTED AS OF 12:01 AM MAY 1, 2015

| PURCHASER'S CREDITS | | SELLER'S CREDITS | |
|---|---|---|---|
| First Down Payment | $ 400,000.00 | Purchase Price | $ 24,321,581.45 |
| Second Down Payment | $ 200,000.00 | Tax Escrow Balance | $ 2,225.14 |
| Promissory Note of Benjamin Landa and Johanon Hirsch payable in 6 months | $ 471,570.82 | Property Insurance Escrow Balance | $ 313,039.20 |
| 50% Mortgage Payments paid by Seller | $ 121,570.82 | Reserve Balance | $ 755,789.86 |
| Assumption of Mortgage | $ 13,828,439.81 | Mortgage Insurance Premium Balance | $ 47,870.31 |
| April mortgage interest | $ 55,198.52 | 2015 Sewer tax adjustment | $17,802.11 |
| Employee Accruals | $ 635,426.80 | Inventory | $ 10,000.00 |
| **TOTAL CREDITS TO PURCHASER** | **$ 15,712,206.77** | **TOTAL CREDITS TO SELLER** | **$25,468,308.07** |
| | | LESS PURCHASER'S CREDITS | $15,712,206.77 |
| | | **NET DUE SELLER AT CLOSING** | **$ 9,756,101.30** |

**Net due in the amount of $9,756,101.30 was wired to McCullough, Goldberger & Staudt, LLP Attorney Escrow Account at closing and confirmed received the morning of May 1, 2015.**

4788137_1

| | |
|---|---|
| **DOWNPAYMENT HELD IN ESCROW BY McCULLOUGH, GOLDBERGER & STAUDT:** | $600,000.00 |
| Interest Earned | $ 679.78 |
| **TOTAL HELD………$600,679.78** | |

**DISBURSED AS FOLLOWS:**

| | |
|---|---|
| Check No. 1161 drawn by McCullough, Goldberger & Staudt, LLP Attorney Trust Account, on Provident Bank n/k/a Sterling Bank, dated April 30, 2015, to the order of Fidelity National Title Insurance Company, as payment of NYS transfer tax in the amount of | $ 97,288.00 |
| Check No. 1162 drawn by McCullough, Goldberger & Staudt, LLP Attorney Trust Account, on Provident Bank n/k/a Sterling Bank, dated April 30, 2015, to the order of Town of Greenburgh Water Department, as payment of Outstanding water bill in the amount of | $ 7,527.12 |
| Total Disbursed | $104,815.12 |
| **BALANCE OF DOWNPAYMENT IN MGS ESCROW** | $ 495,864.66 |
| **PURCHASE PRICE WIRED INTO MGS ESCROW** | $ 9,756,101.30 |
| **TOTAL IN MGS ATTORNEY ESCROW ACCOUNT** | $10,251,965.96 |

4788137_1