HARTER SECREST & EMERY LLP
· *Counsel to Debtors*
12 Fountain Plaza, Suite 400
Buffalo, New York 14202-2293
(716) 853-1616
Raymond L. Fink, Esq. / rfink@hselaw.com
John A. Mueller, Esq. / jmueller@hselaw.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE:

HEBREW HOSPITAL SENIOR HOUSING, INC.,
(A/K/A WESTCHESTER MEADOWS CONTINUING CARE
RETIREMENT COMMUNITY AND FIELDSTONE AT
WESTCHESTER MEADOWS)

CHAPTER 11
CASE NO. 15-13264-mew

                    DEBTOR.

---

IN RE:

HEBREW HOSPITAL HOME OF WESTCHESTER,
INC.,

CHAPTER 11
CASE NO. 16-10028

                    DEBTOR.

---

**DEBTORS' JOINT MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF BANKRUPTCY CODE (I)
AUTHORIZING DEBTOR HEBREW HOSPITAL SENIOR HOUSING, INC. TO (A)
OBTAIN POST-PETITION FINANCING AND (B) USE CASH COLLATERAL, (II)
AUTHORIZING DEBTOR HEBREW HOSPITAL SENIOR HOUSING, INC. TO
EXTEND POST-PETITION FINANCING (III) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, AND (V)
SCHEDULING FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

Hebrew Hospital Senior Housing, Inc. ("HHSH") and Hebrew Hospital Home of

Westchester, Inc. ("HHHW", and collectively with HHSH, the "Debtors"), by and through their

counsel, pursuant to Sections 105, 361, 362, 363(b), 364(c), 503 and 507 of Title 11 of the

United States Code ("Bankruptcy Code"), Rules 2002, 2014(a), 2016, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules"), which by this joint

motion (the "Motion") request entry of an interim order, substantially in the form annexed hereto

as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and together with the

Interim Order, the "DIP Orders"): (a) authorizing HHSH to obtain a super-priority post-petition

debtor-in-possession financing (the "DIP Facility"), secured by liens on all property of HHSH, in

the aggregate principal amount of $2,0000,000; $500,000 of which is to be borrowed on an

interim basis (the "Interim DIP Loan"), pursuant to the terms and conditions of that certain

Secured Super Priority Debtor In Possession Credit Agreement (as amended, supplemented,

restated, or otherwise modified from time to time, the "DIP Credit Agreement") between HHSH,

as borrower, and HHHW, as lender (in such capacity, the "DIP Lender"), a true and accurate

copy of which is annexed hereto as **Exhibit B**; (b) authorizing HHHW, as the DIP Lender, to

extend the DIP Facility to HHSH pursuant to the terms and conditions of the DIP Credit

Agreement, (b) granting the DIP Lender super-priority administrative expense status; (c)

modifying the automatic stay; (d) scheduling a final hearing (the "Final Hearing") thereon; and

(e) granting related relief.  The proposed budget is attached hereto as **Exhibit** C. In further

support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court is the

proper venue for this proceeding pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363(b), 364(c), 364(d) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2..

## BACKGROUND

3.    HHSH commenced its above-captioned chapter 11 case ("HHSH Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 9, 2015 ("HHSH Petition Date") with the United States Bankruptcy Court for the Southern District of New York ("Court") [HS Docket #1]. [1]

4.    HHHW commenced its above-captioned chapter 11 case ("HHHW Chapter 11 Case", and collectively with the HHSH Chapter 11 Case, the "Chapter 11 Cases") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with this on January 8, 2016 ("HHSH Petition Date") with the Court [HW #1 Docket].

5.    No request for the appointment of a trustee or an examiner has been made, in either of the Chapter 11 Cases.    An Official Committee of Unsecured Creditors has been appointed in the HHSH Chapter 11 Case ("HHSH Creditors' Committee") [HS Docket #48].    At present, no Committee of Unsecured Creditors has been formed in the HHHW Chapter 11 Case. Prior to the HHSH Petition Date, Westchester Meadows Resident Council, an ad hoc committee representing the interests of HHSH's continuing care retirement community residents (the "Resident Council"), was formed.

6.    HHSH continues to operate its business and HHHW continues to manage its assets as a debtor-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

---

[1]    Reference to the Court's docket in case #15-13264 are cited as "*HS Docket*" and in case #16-10028 as "*HW Docket*".

7.      HHSH, a New York registered not-for-profit corporation, operates a continuing care retirement community ("CCRC") commonly known as *Westchester Meadows*. The CCRC consists of 120 independent living units, ten enriched housing units, and 20 beds in a skilled nursing facility. The facilities are located at 55 Grasslands Road in Valhalla, New York.

8.      HHHW previously owned, managed and operated a 160 bed skilled nursing facility located at 61 Grasslands road, Valhalla, New York. It also operated a licensed Certified Home Health Agency ("CHHA") which provided and/or arranged for health related services to its clients who resided in their homes.

9.      During 2015, HHHW sold the skilled nursing home facility on a turnkey basis. In a separate unrelated transaction HHHW entered into agreements concerning the sale of the CHHA. Virtually all of HHHW's operating assets were monetized as detailed and described in the HHHW Debtor's Declaration [HW Docket #2].

10.     The initial Declarations filed in each of HHSH and HHHW cases set forth additional information about the respective business operations transactions, and the events leading to their Chapter 11 Cases and said Declarations are respectively incorporated herein by reference.

**RELIEF REQUESTED**

11.     The Debtors seek entry of the DIP Orders granting the following relief:

   a.      entry of the Interim Order authorizing HHSH to obtain from HHHW, as the DIP Lender, the DIP Facility on an interim basis pursuant to the terms and conditions of the DIP Credit Agreement,[2] by and among HHSH and the DIP Lender, attached to the Interim Order as **Exhibit 1,** also Exhibit B to this Motion, (as amended, supplemented, restated or otherwise modified from time to time in accordance therewith, and together with the other documents, agreements and instruments delivered pursuant thereto or

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

executed or filed in connection therewith, including security agreements, mortgages, deposit account control agreements, pledge agreements, guaranties and promissory notes, all as may be reasonably requested by and acceptable in form and substance to the DIP Lender, the "DIP Loan Documents");

b.  authorizing the Debtors to execute and deliver the DIP Loan Documents, and to perform such other acts as may be necessary or desirable in connection therewith;

c.  granting to the DIP Lender security interests in and liens on all of the DIP Collateral (as defined below) (the "DIP Liens") to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, and the DIP Orders, as applicable (collectively, the "DIP Obligations"), which liens and security interests shall be junior only to liens that are valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Pre-Petition Liens as of the HHSH Petition Date and the Carve-Out (as defined below);

d.  granting allowed super-priority administrative expense claims to the DIP Lender on the terms set forth in the Interim Order;

e.  authorizing HHSH to make an initial draw under the DIP Facility in an aggregate amount of up to $500,000, subject to the terms and conditions in this Motion, the DIP Credit Agreement, the Interim Order and the budget attached to the Interim Order as **Exhibit 2**, also Exhibit C to this Motion, (as modified from time to time consistent with the terms of the DIP Loan Documents, the "Budget"), the proceeds of which shall be used to fund ongoing working capital needs of HHSH;

f.  authorizing HHSH to use cash collateral ("Cash Collateral") in accordance with the Budget;

g.  vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders;

h.  waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including under Bankruptcy Rule 6004);

i.  authorizing waiver by HHSH of any right to seek to surcharge against the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or any other law or principle of equity; and

j.  scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final Order, *inter alia*, approving and

authorizing the Debtors' entry into the DIP Facility (including, without limitation, the advance of the financing pursuant to the Interim Order) on a final basis pursuant to the DIP Loan Documents.

## A. HHSH'S PRE-PETITION OBLIGATIONS.

12.    Prior to the HHSH Petition Date, Westchester Industrial Development Agency ("WIDA"), as issuer, and U.S. Bank National Association, as Trustee ("Trustee") entered into that certain Indenture of Trust, dated as of January 1, 2008 (the "Indenture"), pursuant to which certain Continuing Care Retirement Community Revenue Refunding Bonds, Series 2008, in the aggregate principal amount of Fourteen Million, Nine Hundred Eighty-Five Thousand and 00/100 Dollars ($14,985,000.00), were issued (the "Pre-Petition Bonds").  As of the HHSH Petition Date, an aggregate principal amount equal to Five Million, Four Hundred Fifty-Five Thousand and 00/100 Dollars ($5,455,000.00) is owed by HHSH in respect of the Pre-Petition Bonds (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Bonds, the "Pre-Petition Bond Debt").  The Pre-Petition Bonds are secured by, among other things, that certain direct pay letter of credit  (the "Letter of Credit"), issued by the Manufacturers and Traders Trust Company ("M&T") for the account of HHSH and HHH Home Care, Inc. ("Home Care") and for the benefit of the Trustee, in the current stated amount of Five Million, Five Hundred Twenty-Nine Thousand, Seven Hundred Twenty-Six and 00/100 Dollars ($5,529,726.00), of which (i) Five Million, Four Hundred Fifty-Five Thousand 00/100 Dollars ($5,455,000.00) is available to pay the outstanding principal amount of the Pre-Petition Bonds, and (ii) Seventy-Four Thousand, Seven Hundred Twenty-Six and 00/100 Dollars ($74,726.00) is available to pay up to fifty (50) days interest under the Pre-Petition Bonds.

13.    As of the HHSH Petition Date, HHSH, as maker, and HHHW, as holder, were parties to that certain Promissory Note, dated as of November 4, 2015, in an aggregate principal amount equal to Three Million, Five Hundred Thousand and 00/100 Dollars ($3,500,000.00) (the

6

"Pre-Petition Note"). As of the HHSH Petition Date, HHSH owes HHHW the entire principal amount of Three Million, Five Hundred Thousand and 00/100 Dollars ($3,500,000.00) (together with any and all accrued interest, fees and expenses payable under the Pre-Petition Note, the "Pre-Petition Bridge Loan" and, together with the Pre-Petition Bond Debt, the "Pre-Petition Secured Debt").

14.     On October 20, 2015, HHSH, HHHW, the Office of the Attorney General of the State of New York (the "AG"), and Carl Winterrose, as an authorized agent of the Resident Council entered into that certain Restructuring Support and Loan Agreement (as amended and in effect from time to time, the "RSA" and together with the Pre-Petition Bonds, the Letter of Credit and the Pre-Petition Note, the "Pre-Petition Credit Documents"), pursuant to which the AG consented to the use of the proceeds of the Pre-Petition Note in accordance with the terms of the RSA. The RSA, among other things, provided that an event of default occurred if HHSH failed to commence a proceeding for bankruptcy relief under chapter 11 of the Bankruptcy Code by no later than November 30, 2015, and that the proceeds of any debtor in possession financing would be used, in part, to pay off the Pre-Petition Note. The signatory parties verbally agreed to extend the November 30, 2015 deadline to the HHSH Petition Date.

15.     As of the HHSH Petition Date, the aggregate outstanding principal amount owed by HHSH under the Pre-Petition Credit Documents, respectively to the Trustee and/or M&T (collectively, "Senior Secured Creditors") and HHSH together with the Senior Secured Creditors the ("Pre-Petition Secured Creditors"), was not less than Eight Million, Nine Hundred Fifty-Five Thousand 00/100 Dollars ($8,955,000.00) (together with accrued and unpaid interest, fees or expenses, and all other amounts due in accordance with the terms of the Pre-Petition Credit Documents, the "Pre-Petition Obligations").

7

16.      Pursuant to that certain Bargain and Sale Deed, dated August 4, 2000, WIDA acquired fee title to HHSH's real property and improvements located on Grasslands Road in the Valhalla section of the Town of Greenburgh, County of Westchester, State of New York, consisting of a continuing care retirement community including 120 Independent Residential Apartments, 10 Enriched Housing Apartments, 20 skilled nursing facility beds, common areas and facilities, an indoor pool, a convenience store and administration areas and related infrastructure such as road, sewers, utilities, parking lots, drainage areas and maintenance facilities (the "Property"), and leased the Property back to HHSH pursuant to and in accordance with that certain Amended and Restated Lease Agreement, dated as of January 1, 2008 (the "Pre-Petition Lease Agreement").

17.      Prior to the HHSH Petition Date, HHSH entered into that certain (i) Mortgage and Security Agreement, dated as of January 1, 2008, by and among WIDA, HHSH and M&T (the "Pre-Petition First Lien Mortgage"), (ii) General Assignment of Leases and Rents, by and among WIDA, HHSH, and M&T (the "Pre-Petition Assignment"), (iii) Hazardous Substances Indemnity Agreement, dated as of January 1, 2008, by and among HHSH, Hebrew Hospital Home Foundation, Inc., and M&T (the "Pre-Petition Environmental Indemnity"), (iv) Pledge and Assignment of Variable Rate Bonds, dated as of January 1, 2008, by and among HHSH, Hebrew Hospital Home Foundation, Inc and M&T Bank (the "Pre-Petition Pledge"), (v) Operating Account Assignment and Security Agreement, dated as of January 1, 2008, by and among HHSH and M&T Bank (the "Pre-Petition Operating Account Agreement") and together with the Pre-Petition First Lien Mortgage, the Pre-Petition Assignment, the Pre-Petition Environmental Indemnity, the Pre-Petition Pledge, and the Pre-Petition Operating Account Agreement, the "Pre-Petition First Lien Security Documents), granting to M&T a first-priority security interest in and

8

liens (the "Pre-Petition First-Priority Liens") on certain of HHSH's and WIDA's assets (such

assets as described in the Pre-Petition Security Documents, the "Pre-Petition First Lien

Collateral").

18.    Prior to the HHSH Petition Date, to secure the obligations under the Pre-Petition

Note, HHSH entered into that certain Mortgage, dated as of November 4, 2015 and recorded on

November 5, 2015, between WIDA, HHSH and HHHW (the "Pre-Petition Second Lien

Mortgage" and together with the Pre-Petition First Lien Security Documents, the "Pre-Petition

Security Documents"), granting to HHHW a second-priority security interest in and lien (the

"Pre-Petition Second-Priority Liens" and together with the Pre-Petition First-Priority Liens, the

"Pre-Petition Liens") on certain of HHSH's and WIDA's assets (such assets as described in the

Pre-Petition Second Lien Mortgage, the "Pre-Petition Second Lien Collateral and together with

the Pre-Petition First Lien Collateral, the "Pre-Petition Collateral").

## B. NEED FOR POST-PETITION FINANCING UNDER THE DIP FACILITY.

19.    As described in the Declaration, HHSH's Chapter 11 Case is the result of

operational and financial difficulties that have plagued the company since its inception.

20.    In February of 2015, HHSH formed an ad hoc restructuring committee (the

"Restructuring Committee") to develop a strategic course for consideration by HHSH's board.

The Restructuring Committee recommended the engagement of Harter Secrest & Emery LLP as

legal counsel and Getzler Henrich & Associates LLC as its financial advisor. The board duly

engaged both firms in the spring of 2015.

21.    HHSH's board promptly concluded that HHSH should undertake an expedited

effort to explore and market a sale of HHSH's business and assets.    HHSH engaged the

Marwood Group for this purpose, particularly based upon its successes with facilitating the sale of other affiliates of HHSH (*i.e.*, the home care programs).

22.     Following an expedited marketing effort, the Marwood Group identified a prospective *stalking horse* buyer.  A letter of intent was entered into which contemplated a sale process through a chapter 11 filing by HHSH.  However, the letter of intent never progressed to a definitive asset purchase agreement.   As a result of concerns about the terms of the *stalking horse* bid, the Resident Council engaged both legal counsel and a financial adviser to provide guidance and representation and, thereafter, HHSH's board agreed to terminate the pursuit of the *stalking horse* letter of intent and restart the marketing and sale process.

23.     To that end, HHSH engaged RBC Capital Markets ("RBC") on September 15, 2015 as its investment banker.  Since that time, RBC has been actively marketing HHSH's business in an attempt to identify a stalking horse purchaser willing to purchase HHSH's business on terms that will ensure a seamless transition for its residents and maximize value and recovery to HHSH's estate and creditors.

24.     HHSH has an imminent and critical need to obtain the post-petition financing under the DIP Facility and to use Cash Collateral so that it can ensure that services to its residents remain undisturbed and that HHSH has sufficient runway to operate through an orderly sale process.  The quality of care for the clients who reside in HHSH's enriched housing and skilled nursing facilities is of paramount importance, and without the DIP Facility HHSH will have insufficient funds to service those needs on an ongoing basis.

25.     The funds received under DIP Facility will be used to pay various parties that provide essential services to HHSH in the ordinary course of business and enable it to operate, maintain and insure its assets through the sale process.  These parties include employees, third

party vendors, utilities, insurance companies, taxing authorities, professionals, consultants and advisors. The services provided by these parties are absolutely critical to the well-being of HHSH's residents and the preservation of HHSH's business and asset value. Without access to the DIP Facility and the use of Cash Collateral, HHSH would suffer immediate and irreparable harm to the significant detriment of HHSH's estate, its residents and its creditors.

26.    HHSH's post-petition liquidity needs through this sale process cannot be met through operating revenues alone, and given HHSH's financial circumstances and lack of unencumbered assets for reasons set forth herein, it does not believe that it could obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense, or obtain credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of HHSH and its estate that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of HHSH and its estate that is subject to an existing lien.

## C. DEBTOR'S MARKETING EFFORTS TO SECURE THE DIP FACILITY

27.    As described in further detail in the HHSH Declaration, HHSH and RBC, with the assistance of Cohn Reznick and DLA Piper (the "Resident Council's Professionals") sought out prospective lenders who would be interested in providing a debtor-in-possession facility to pay the Pre-Petition Obligations in accordance with the terms of the RSA and to provide sufficient working capital to guide HHSH through the sale process.

28.    The initial prospective *stalking horse* purchaser offered a post-petition credit line with a maximum discretionary lending capacity of up to Eight Million and 00/100 Dollars ($8,000,000.00) payable with interest at the per annum rate of twelve percent (12%) and subject to credit bid features. In mid-September 2015, HHSH received a proposal for an Eight Million

11

and 00/100 Dollar ($8,000,000.00) post-petition credit line from another potential lender payable with interest at a competitive rate with that of the proposed DIP Lender, but availability was subject to a constrained borrowing base. Upon analysis, in either case the Eight Million and 00/100 Dollars ($8,000,000.00) credit lines were not sufficient as HHSH requires a larger post-petition credit line.

29.    Prior to the HHSH Petition Date, HHSH received and accepted a proposal for an Twelve Million Two Hundred Thousand 00/100 Dollar ($12,200,000.00) post-petition credit facility (the "Lapis DIP Facility") to be extended by Millennium Trust Company, LLC (as Custodian FBO Lapis Municipal Opportunities Fund II LP and Lapis Aquilo Fund II LP), as lender. The Lapis DIP Facility contemplated the payment in full of the Pre-Petition Obligations.

30.    Strident opposition was filed in response to HHSH's motion seeking approval of the Lapis DIP Facility [HS Dockets #5, 26, 31 and 34]. The numerous grounds for the objections were similar to those raised by the Court on December 15, 2015. The prospects for obtaining approval of the Lapis DIP Facility are dim. Upon information and belief, M&T has also declined the opportunity to provide any post-petition working capital. HHHW is the only remaining prospect.

31.    The DIP Lender has indicated a willingness to provide HHSH with capital for operations, upon the terms and conditions set forth in the DIP Loan Document and the Interim Order, and pursuant to the terms of an agreed upon Budget. After considering all of its alternatives, HHSH has concluded, in an exercise of sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Loan Documents and the Interim Order represents the best financing presently available to HHSH. These funds will be used to maintain HHSH's assets through the orderly sale process.

12

32.    HHSH and HHHW have negotiated the DIP Facility and the DIP Loan Documents in good faith, and HHSH believes that the terms of the DIP Facility are fair and reasonable, consistent with the market, reflect HHSH's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

33.    Without the DIP Facility, HHSH will not have sufficient resources to conduct or complete an orderly, value maximizing sale process, and HHSH's estate and creditors will suffer as a result. Preservation of the value of HHSH's business and assets is critical. HHSH respectfully submits that the DIP Facility is essential for all of the above reasons.

## D. SUMMARY OF PRINCIPAL TERMS OF DIP FACILITY.

34.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, set forth below is a summary[3] of the terms of the material terms of the Interim Order and the DIP Documents:

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| Borrower: | HHSH. *See* DIP Credit Agreement, Preamble; Interim Order at ¶1. |
| DIP Lender: | HHHW. *See* DIP Credit Agreement, Preamble; Interim Order at ¶1 |
| Commitment: | $2,000,000 senior secured super priority non-amortizing term loan facility. *See* DIP Credit Agreement §2.01; |
| Borrowing Limits: | Initial Loan: $500,000 (subject to Budget) *See* DIP Credit Agreement §2.01(a); Interim Order at ¶¶ F.(iv).(a),4. Subsequent Loans: in an aggregate amount, together with the Initial Loan, not to exceed $2 million (subject to Budget) *See* DIP Credit Agreement §2.01(b); Interim Order at ¶ F.(iv).(b). |
| Purpose/Use of Funds: | The Interim Order authorizes HHSH, subject to the conditions precedent and other terms and conditions set forth in the DIP Loan Documents, in accordance with the Budget, and consistent |

---

[3]    The description of the terms and conditions of the DIP Credit Agreement and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties interested with an overview of the significant terms thereof and should only be relied upon as such. The summaries are qualified in their entirety by the DIP Credit Agreement and the Interim Order. In the event there is a conflict between this Motion and the DIP Credit Agreement or the Interim Order, the DIP Credit Agreement or the Interim Order, as applicable, shall control in all aspects.

| | |
|---|---|
| | with the terms of this Interim Order, make an interim draw on the DIP Facility in the amount of $500,000 (the "Initial Loan"), the proceeds of which shall be used to fund the ongoing working capital needs of HHSH and for the payment of any fee or tax due in connection with the recording of the Collateral Documents. *See* DIP Credit Agreement § 2.09; Interim Order at ¶¶ F.(iv).(a), 10.<br><br>The proceeds of the Subsequent Loans shall be used solely, and strictly in accordance with the Budget, following the entry of the Final Order as follows: (i) for the payment of ordinary course of business post-petition operating expenses in such amounts and during such periods as provided for in the Budget; and (iii) for the payment of fees of the United States Trustee and allowed Chapter 11 estate professional fees and expenses (collectively "Professional Fees") in the amount of $400,000 (the "Carve Out"). *See* DIP Credit Agreement §2.09; Interim Order at ¶ F.(iv).(b). |
| Conditions to Closing and Borrowing: | Initial Term Loan:<br>• Entry of Interim Order;<br>• Executed counterparts of the DIP Credit Agreement and other DIP Loan Documents ;<br>• Evidence of insurance acceptable to Lender;<br>• Certified resolutions approving each DIP Loan Document, secretary's certificate, officer's certificate attesting to truthfulness of representations and warranties, and other organizational and good standing documents;<br>• Evidence satisfactory to the DIP Lender that the proceeds will be used in accordance with the Budget; and<br>Subsequent Term Loans:<br>• Entry of the Final Order.<br>Conditions to All Borrowings:<br>• Representations and warranties all correct in material respects;<br>• No Default or Event of Default;<br>• DIP Lender's fees have been paid;<br>• Borrowing will not violate any law;<br>• Post-petition Entrance Fee Deposits shall have been deposited in escrow *See* DIP Credit Agreement §§3.01-3.03. |
| Pricing, Economic Terms and Fees: | Loans under the DIP Facility will accrue interest at the rate of 5.75% per annum. DIP Credit Agreement at § 2.05(a). Upon the occurrence and during the continuance of an Event of Default, Loans under the DIP Facility will accrue interest at the rate of 7.75% per annum. *See* DIP Credit Agreement § 2.05(b). |
| DIP Collateral: | Subject only to (i) the Pre-Petition First Priority Liens, (ii) valid, |

| | |
|---|---|
| | enforceable, non-avoidable liens in existence and senior in priority to the Pre-Petition Secured Debt as of the HHSH Petition Date, and (iii) the Carve-Out, to secured the Obligations under the DIP Facility, the DIP Lender will receive, pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, (a) an automatically fully perfected, valid, enforceable, unavoidable, post-petition mortgage, security interest and Lien on the Mortgaged Property which is pari passu in priority and right of payment with the Pre-Petition Second Priority Liens, and (b) an automatically fully perfected, valid, enforceable, unavoidable, and first-priority security interest and lien on all of HHSH's other assets and all "property of the estate" (within the meaning of the Bankruptcy Code), of any kind or nature whatsoever, including, without limitation, all of HHSH's existing and future acquired property interests of any nature whatsoever, real and personal, tangible and intangible, (including post-petition assets), including, without limitation, owned and leased real property, any other interests in real property, accounts receivable, inventory, equipment, cash, deposit accounts, investment property, general intangibles, payment intangibles, supporting obligations, instruments, documents, chattel paper, commercial tort claims, insurance, licenses and permits, intellectual property, trade secrets, goodwill, machinery, equipment, chattel paper, contract rights (including rights and privileges in respect of any Government Contracts), tax refunds, and avoidance actions available to HHSH or its' estate, and all proceeds of the foregoing (collectively, the "DIP Collateral"). |
| Effect on Existing Liens: | The Liens securing the DIP Facility will be subject only to the Pre-Petition First Priority Liens, the Pre-Petition Second Priority Liens, customary permitted liens and the Carve-Out. DIP Credit Agreement at § 5.02(a). |

| | |
|---|---|
| Carve-Out: | The DIP Facility provides that an amount of up to $400,000 in proceeds of borrowings under the DIP Facility will be available for the payment of U.S. Trustee fees and applicable interest, professional fees of the Debtors and the official committees of unsecured creditors. Interim Order at ¶¶ 26, 27; DIP Credit Agreement at § 2.09(b). |
| Cross-Collateralization: | The DIP Facility requires that, for the adequate protection of the DIP Lender under Sections 361 and 364 of the Bankruptcy Code for the obligations of HHSH to HHHW under the Pre-Petition Bridge Loan in the form of a legal, valid and enforceable first priority security interest in and Lien upon the Collateral (subject to the payment of Carve Out and the Prepetition Permitted Liens) securing the obligations of HHSH to HHHW under the Pre-Petition Bridge Loan, which shall be pari passu in priority and right of payment with the first priority security interest in and Lien upon the Collateral (subject to the payment of the Carve Out and the Prepetition Permitted Liens) granted to HHHW, as the DIP Lender, under the DIP Facility. |
| Roll-Up Provision: | The DIP Facility does not call for a roll-up of Pre-Petition Secured Debt. |
| Limitations on Funding: | No proceeds of the DIP Facility may be used to pay any or all claims for services rendered by any of the professionals retained by HHSH or the official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter against the DIP Lender or any of its Affiliates.   DIP Credit Agreement at § 2.09(b); Interim Order at ¶ 28. |
| Events of Default: | The DIP Facility sets forth a number of Events of Default, including, but not limited to (a) failure to pay principal, interest or any other amount when due under the DIP Facility, (b) default under the RSA, (c) the entry of an order appointing a Chapter 7 or Chapter 11 trustee in the HHSH Chapter 11 Case, (d) reversal or modification of the Interim Order or the Final Order in a fashion not satisfactory to the DIP Lender, and (e) breach of negotiated budget variances. DIP Credit Agreement at § 6.01. |
| Pre-Payment: | HHSH may prepay the DIP Facility in part or in full prior to the Maturity Date without premium or penalty. DIP Credit Agreement at § 2.04(c). |
| Joint Liability: | There is no joint liability with parties other than HHSH. |
| Funding of Non-Debtor Entities: | No amounts under the DIP Facility shall be made available to entities other than HHSH. |
| Indemnification: | The DIP Facility contains customary indemnification provisions whereby HHSH agrees to indemnify the DIP Lender and certain of its related parties (the "Indemnified Parties") from losses, |

| | |
|---|---|
| | claims and expenses incurred by or asserted or awarded against any Indemnified Party in connection with the DIP Facility and any of the transactions contemplated therein. DIP Credit Agreement at § 3.01(b)(i). |
| Repayment: | Interest shall accrue under the DIP Facility and shall be payable on the Maturity Date. The entire principal amount of the DIP Facility, together with interest and fees thereon, is due and payable the date that is the earliest of: (a) the closing date of any replacement debtor in possession financing for HHSH which provides for the payment in full in cash of all obligations owing under the DIP Facility; (b) the closing date of the sale of all or substantially all of the collateral securing the obligations under the DIP Facility; (c) the effective date of a confirmed plan of reorganization in the HHSH Chapter 11 Case; (d) dismissal of the HHSH Chapter 11 Case; (e) conversion of the HHSH Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (f) the entry of an order of the Bankruptcy Court granting relief from the automatic stay permitting the exercise of remedies by any pre-petition secured creditor with respect to collateral that is necessary for HHSH's reorganization or sale; and (g) acceleration of the obligations under the DIP Facility pursuant to its terms, including without limitation following an Event of Default under the DIP Facility. DIP Credit Agreement at §§ 2.03, 2.05. |
| Financial Covenants: | HHSH shall not make payments other than those set forth in the Budget; *provided*, that (i) other than professional fees, (A) actual disbursements for any prior week for any line item in the Budget may have a positive variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget and (B) actual cash receipts for any prior week for any line item in the Budget may have a negative variance that is no greater than twenty percent (20%) of the corresponding amounts reflected on the Budget, (C) actual disbursements for all prior weeks for any line item in the Budget may have a positive variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget, and (D) actual cash receipts for all prior weeks for any line item in the Budget may have a negative variance that is no greater than ten percent (10%) of the corresponding amounts reflected on the Budget and (ii) the actual disbursement of professional fees shall not exceed $400,000. DIP Credit Agreement at §5.04(a). |
| Release: | HHSH will provide a general release of the DIP Lender and its affiliates all past, present and future actions, causes of action, demands, suits, claims, and liabilities. DIP Credit Agreement at § 8.18. |
| Section 506(c)Waiver: | The obligations under the Facility and the Liens securing the Facility shall not be subject to, and HHSH waives the right to, surcharge the same pursuant to Section 506(c) of the Bankruptcy Code. DIP Credit Agreement at § 7.03; Interim Order at ¶ 29. |

| Section 552(b) Waiver: | The obligations under the Facility and the Liens securing the Facility shall not be subject to, and HHSH waives the right to, assert any rights under Sections 552 of the Bankruptcy Code. DIP Credit Agreement at §7.03; Interim Order at ¶ 32. |
|---|---|

## BASIS FOR RELIEF

### A. THE PROPOSED DIP FACILITY SHOULD BE APPROVED

#### I.    The Requested Relief Should Be Granted Pursuant to Sections 364(c) and 364(d)(l) of the Bankruptcy Code.

35.    As set forth above, HHSH's ability to maximize the value of its estate hinges upon its being able to access post-petition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. *See* 11 U.S.C. § 364. Pursuant to Section 364(c) of the Bankruptcy Code, if a debtor cannot obtain post-petition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.

36.    Under Section 364 of the Bankruptcy Code, courts also may authorize post-petition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See id.* Specifically, Section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)    the [debtor] is unable to obtain credit otherwise; and

18

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

Id. § 364(d)(l).

      *a.*     **HHSH Has Exercised Its  Business Judgment in Entering Into the DIP Facility.**

37.     A debtor's decision to enter into a post-petition lending facility under Section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties-in-interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

38.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) (noting that "[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of a debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the

19

estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); see *also In re Trans World Airlines, Inc.*, 163 B.R. at 974 (approving interim loan, receivables facility and asset based facility based upon prudent business judgment of the debtor). Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14. In determining whether HHSH has exercised sound business judgment, the Court should consider the economic terms of the DIP Facility in light of current market conditions. *See In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009).

40.     HHSH has exercised sound business judgment in determining the appropriateness of the DIP Facility and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the Interim Order. The Interim Order contains terms and conditions that are the best available under the circumstances and provides HHSH with sufficient liquidity during the period of the Budget. In addition, the Interim Order preserves the rights of any statutory committee of unsecured creditors, to investigate and challenge the validity, amount, perfection, priority, extent or enforceability of pre-petition security interests.

41.     Moreover, approval of the Interim Order will provide HHSH with immediate and ongoing access to funds to pay its current and ongoing operating expenses, including post-petition wages and salaries and vendor costs. Unless these expenditures are made, HHSH will be

forced to cease operations, which would result in irreparable harm to its business and deplete going concern value. Equally important, without borrowings under the Interim Order, the health and well-being of the residents of the Retirement Community would be jeopardized. Because cash collateral is insufficient to fund such expenditures, the credit provided under the Interim Order essential to a successful reorganization.

42.    Accordingly, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, HHSH respectfully submits that it should be granted authority to obtain financing from the DIP Lender on the terms set forth in the Interim Order.

**b.    The DIP Facility Represents the Best Financing Available.**

43.    A debtor seeking financing under Section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. *See, e.g., Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of Section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[T]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

44.    Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an

21

exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under Section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Ames Dep't Stores*, 115 B .R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under Section 364(a) and (b)).

45.     HHSH and its advisors have solicited proposals from and negotiated with several possible financing sources in an effort to secure debtor in possession financing on the best terms available. HHSH has determined that the terms and conditions of the Interim Order are the best available under the circumstances and address HHSH's working capital needs. Post-petition financing is not otherwise available without granting, pursuant to Sections 364(c)(l) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the collateral for the DIP Facility pursuant to Section 364(c) and (d) of the Bankruptcy Code. HHSH is unable to obtain the necessary post-petition financing that it needs on terms more favorable than those provided by the Interim Order. Accordingly, HHSH's efforts to obtain post-petition financing satisfy the statutory requirements of Section 364(c) of the Bankruptcy Code.

    *c.*    **The DIP Facility Is Necessary to Maintain HHSH's Ongoing Business Operations.**

46.     The DIP Facility will provide essential working capital, allowing HHSH to maintain the value of its assets and its ongoing business operations. In addition, the DIP Facility will provide HHSH's various constituencies, including residents, employees, vendors, service

providers, and regulatory agencies with confidence HHSH's ability to maintain operations during the HHSH Chapter 11 Case.

47.    If the relief sought in this Motion is denied or delayed, HHSH likely will experience business disruptions, an inability to provide proper resident care, and difficulty maximizing value for the estates may be irreparably damaged. Accordingly, the DIP Facility is necessary to maximize value for HHSH's estate and inure to the benefit of creditors and all parties in interest, including residents of the Retirement Community.

### d.    The Terms of the Interim Order are Fair, Reasonable, and Adequate Under the Circumstances.

48.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen Maclean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). Here, the terms and conditions of the Interim Order were negotiated in good faith and at arm's length among the parties and provide HHSH with essential working capital and maintain their respective business operations. Indeed, when viewed in its totality, the Interim Order reflects HHSH's exercise of prudent business judgment consistent with their fiduciary duties and is supported by fair consideration.

### e.    Section 364(e) Protections Should Apply to the Interim Order.

49.    The terms and conditions of the Interim Order are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the

23

meaning of Bankruptcy Code Section 364(e), and is entitled to all of the protections afforded by that Section.

50.    HHSH believes that the budgets required under the terms of the DIP Facility, considering the availability of post-petition financing and considering all available assets, will be adequate to pay all administrative expenses due or accruing during the period covering the DIP Facility.

51.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default, all rights and remedies under the DIP Credit Agreement; provided, however, that upon the occurrence and during the continuance of an Event of Default as determined by the DIP Lender in its sole discretion, HHSH, any statutory committee appointed in the Chapter 11 Cases, or the Resident Council shall have the right to contest, and only to contest, such determination of the occurrence of an Event of Default within three (3) Business Days of such occurrence by filing an expedited motion with the Bankruptcy Court, and unless the Bankruptcy Court shall have determined that an Event of Default has not occurred and/or is not continuing within two (2) Business Days of the filing of such motion, the automatic stay shall automatically be terminated without further notice or order, and the DIP Lender shall be immediately entitled to exercise all remedies available to it under the DIP Facility or applicable law.

52.    Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in HHSH's business judgment, are reasonable and fair under the present circumstances.

   *f.*    *The DIP Facility Is In the Best Interests of HHHW's Estate.*

24

53.    Approval of the DIP Facility is in the best interests of the estate of HHHW, as DIP Lender. The moneys advanced to HHSH will be repaid with a 5.75% rate of interest, a significant investment return for the HHHW estate. That investment return is low risk, since the Loans made by HHHW, as DIP Lender, are entitled to superpriority claim and lien protection, as well as default protections which are comparable to those generally provided to non-affiliated debtor in possession financing lenders. Moreover, mutual creditors of HHSH and HHHW will benefit from an ultimate sale of the HHSH business, which the financing provided by HHHW could facilitate.

54.    Moreover, the DIP Facility requires that, for the adequate protection of the Lender under Sections 361 and 364 of the Bankruptcy Code for the obligations of HHSH to HHHW under the Pre-Petition Bridge Loan in the form of a legal, valid and enforceable first priority security interest in and Lien upon the Collateral (subject to the payment of the Carve Out and the Prepetition Permitted Liens) securing the obligations of HHSH to HHHW under the Pre-Petition Bridge Loan, which shall be pari passu in priority and right of payment with the first priority security interest in and Lien upon the Collateral (subject to the payment of the Carve Out and the Prepetition Permitted Liens) granted to HHHW, as the DIP Lender, under the DIP Facility.

## INTERIM APPROVAL REQUESTED

55.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

56.      Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court (a) conduct an expedited preliminary hearing on the Motion and authorize HHSH to borrow $500,000 on an interim basis to (i) maintain and finance the ongoing operations of HHSH, and (ii) avoid immediate and irreparable harm and prejudice to HHSH's estate and all parties in interest, and (b) schedule a Final Hearing on the relief requested herein.

57.      Absent authorization from the Court to obtain the Interim DIP Loan pending a Final Hearing, HHSH will be immediately and irreparably harmed. As set forth above, HHSH's ability to enter into the DIP Credit Agreement is critical to the success of its chapter 11 case and the ability to preserve any value for its creditors. Without immediate liquidity provided by access to the Interim DIP Loan, HHSH will simply be unable to conduct normal business operations, and its estate, creditors, employees, and equity holders will be immediately and irreparably harmed.

## REQUEST FOR FINAL HEARING

58.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no later than January 22, 2016 as an interim hearing for consideration of entry of the Interim Order and February 16, 2016 as a hearing on the Final Order.

59.      The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## RESERVATION OF RIGHTS

60.      Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against HHSH, (b) a waiver of HHSH's or any appropriate party-in-

interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under Section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to this Interim Order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of HHSH's right to dispute such claim subsequently.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND (H)

61.    This Application is necessary to prevent irreparable damage to HHSH's operations and to preserve value for its estate. Accordingly, to the extent applicable and to successfully implement the foregoing, HHSH respectfully seeks a waiver of the notice requirements and 14-day stay under Bankruptcy Rules 6004(a) and (h) respectively.

## NOTICE

62.    The Debtors will provide notice of this Motion to the following: (i) Office of the U.S. Trustee for the Southern District of New York; (ii) parties included on each of Debtors' Lists of Creditors Holding Twenty (20) Largest Unsecured Claims; (iii) the Official Committees of Unsecured Creditors and their proposed counsel; (iv) ; (v) the Attorney General of the State of New York; (vi) the New York State Department of Health and Department of financial Services; (vii) parties who have filed a notice of appearance in either of these Chapter 11 Cases; and (viii) all parties entitled to receive notice under Bankruptcy Rule 2002 and the Local Rules. The Debtors submit that they do not need to provide any other or further notice.

## NO PRIOR REQUEST

63.    The Debtors have not made any prior request for the relief sought in this Motion to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as **Exhibit A**, along with such other relief as this Court deems just and proper.

Dated: January 8, 2016           **HARTER SECREST & EMERY LLP**
        Buffalo, New York

                              s/*Raymond L. Fink*
                            Raymond L. Fink, Esq.
                            John A. Mueller, Esq.
                            *Counsel to Debtors*
                            12 Fountain Plaza, Suite 400
                            Buffalo, New York  14203-2293
                            (716) 853-1616
                            rfink@hselaw.com
                            jmueller@hselaw.com